02cvd 973 memo
Pt. 1  Cover pg. — pg 29
pt 2  pg  30 - 59

# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

## AT BRIDGEPORT

| | |
|---|---|
| HADLEY MACPHERSON (EGAN) | NO.  3:02CV1973  JCH |
| PLAINTIFF | |
| | SEPTEMBER 10, 2004 |
| VS. | |
| | |
| DR. JOHN PERSING | BRIEF IN SUPPORT |
| and | OF PLAINTIFF'S |
| YALE NEW HAVEN HOSPITAL | MEMORANDUM OF |
| and | LAW |
| YALE UNIVERSITY | |
| DEFENDANTS | |
| | CIVIL ACTION |

# TABLE OF CONTENTS

Statement of the Issues Presented                                              2

Facts                                                                          3

Legal Argument                                                                 20


A.    Dismissal of Claims Against Yale-New Haven Hospital

    1.    Original Basis for Yale-New Haven Hospital's Liability for           20
the tortious acts of Dr. John Persing, committed prior to, and on,
December 6, 2000.

    2.    Newly Discovered and  Further Basis for Yale-New Haven Hospital's    24
Liability for the tortious acts of Dr. Gopal Grandhige, Nurse RoseMary
Asiedu, and Dr. Peter Atanassoff, committed on December 6, 2000.

        a.    relating to unauthorized treatment                               25

        b.    fraudulent record keeping regarding that unauthorized            25
treatment.

    3.    Newly Discovered and Further Basis for Yale-New Haven Hospital's     30
Liability for the tortious acts of Dr. John Persing, .committed on, and
subsequent to, December 6, 2000.

        a.    relating to the illegal and fraudulent alteration of a           32
pre-op note in the medical record

        b.    relating to the illegal and fraudulent alteration and creation   32
of  post-op  notes

        c.    relating to the illegal making of a fraudulent record in the     33
Peri-operative documents as to the events that took place on
December 6, 2000.

d.  relating to the illegal fraudulent concealment of information    34
pertinent to the plaintiffs ability to ascertain the claims she has
a legal right to pursue by the omission of required information
in the Operative Report.

e.  relating to the illegal and conspiratorial interference with the    35
plaintiff's ability to acquire the portion of her medical record
in the possession of  from Dr. Gary Price.

B.    <u>Dismissal of Count Two as to Dr. John Persing, and Yale University</u>

1.    Consent Generally    41

2.    Informed Consent as it Relates to Disclosure of Risks, Side Effects,    50
and alternative procedures,

3.    Lack of Consent under Assault and Battery, or Negligence    54

4.    Consent Obtained on a Contingent Basis    60

5.    Consent Obtained by Fraud    62

6.    Consent for a Procedure Different From the Procedure Originally    62
Consented to

7.    Consent for Procedure Significantly More Complex or More Dangerous    64
than the Procedure Originally Consented to

8.    Consent for Procedure Radical or Experimental in Nature    65

9.    Consent under the "Patient's Bill of Rights"    65

Table of Authorities    67

# BRIEF IN SUPPORT OF MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS ALL CLAIMS AGAINST YALE-NEW HAVEN HOSPITAL, AND COUNT TWO AGAINST DR. JOHN PERSING AND YALE UNIVERSITY

The defendants, Yale-New Haven Hospital, Dr. John Persing, and Yale University, filed a subsequent Motion to Dismiss dated February 17, 2004, seeking the following relief:

1. The defendants request the dismissal of all claims against the defendant, Yale-New Haven Hospital, on the contention that the hospital owed no legal duty to the plaintiff, Hadley Macpherson, as it cannot be held liable for acts committed by a non-employee physician.

2. The defendants request the dismissal of Count Two against the remaining defendants, Dr. John Persing, and Yale University, on the contentions that "there was a single surgery", "a single requirement that consent be obtained", "a single claim for lack of consent", "the claim remains the same for both, (counts): that being that Dr. John Persing performed facial surgery on December 6, 2000, without the plaintiff's informed consent", the Second Count "purports to be an independent cause of action from the First Count", "there is no basis upon which a single negligence claim can be separated into two counts."

The plaintiff submits this Brief in support of her Memorandum of Law in opposition to the defendants' Motion to Dismiss.

1

## Statement of the Issues Presented.

1.  Whether the defendant, Yale-New Haven Hospital, can be held vicariously liable under the theory of Respondeat Superior if the defendant, Dr. John Persing, is in fact an actual employee of the defendant Yale-New Haven Hospital?

2.  Whether, the defendant, Yale-New Haven Hospital, can be held vicariously liable under the theory of Ostensible Agency if it held itself out to be the employer of the defendant, Dr. John Persing, though he may only be an independent contractor?

3.  Whether, the defendant, Yale-New Haven Hospital,  can be held vicariously liable under the theory of Respondeat Superior for the tortious acts committed by the nurses, medical Residents, and physicians in their employ?

4.  Whether the defendant, Yale-New Haven Hospital, can be held liable under the theory of Corporate Negligence, or Non-Delegable Duty, for its own tortious administrative acts, whether committed negligently or intentionally, which caused damage to the plaintiff?

5.  Whether there was only "a single surgery"?

6.  Whether there was only "a single requirement that Consent be obtained"?

7.  If there were more than one surgery performed, and each surgical procedure had its own separate requirement for consent, then should the plaintiff be allowed to allege separate claims for lack of consent for each individual surgery, or surgical procedure ?

8.  Do the allegations in the plaintiff'a Amended Complaint indicate that she is alleging only only a single "Negligence" claim, or did the plaintiff clearly indicate that she was also alleging claims for Intentional Torts, the allegations of which in Count One and Count Two, are clearly not the same, did not occur at the same time and place, do not have the

same fact patterns, and do not have the same elements to prove?

9.    Whether the facts alleged in the Amended Compliant, if taken as true, support the

existence and occurrence of separate transactions, or tortious events, that would

each then carry their own separate and distinct liabilities based on the different

facts surrounding each transaction and event, entitling the plaintiff to separate counts?

## Facts

In September of 2000, the plaintiff, Lisa Egan, contacted the defendant, Yale-New Haven

Hospital, in order to hire a plastic surgeon in their employ. The plaintiff, Lisa Egan, was

referred by the defendant, Yale-New Haven Hospital, to the defendant, Dr. John Persing, who

was Chief of their Plastic Surgery Department at that time.

The plaintiff, Lisa Egan, contacted the office of the defendant, Dr. John Persing, through

the main switchboard of Yale-New Haven Hospital, in an effort to secure his services for the

performance of plastic/cosmetic surgery on different portions of her face,

The plaintiff, Lisa Egan, believed and still believes the defendant, Dr. John Persing, is an

employee of the defendant, Yale-New Haven Hospital.

The defendant, Yale-New Haven Hospital, held out the defendant, Dr. John Persing, as

being their employee by the use of his title of Chief of Plastic Surgery, his fax heading stating

"Yale Plastic Surgery", his telephone line being accessed through their switchboard, and the fact

that his offices are located in their Plastic Surgery Department, a department located in the

building named Yale Physicians Building which is openly accessed and attached to the other

main buildings of the defendant, Yale-New Haven Hospital.

3

The legal department of the defendant, Yale-New Haven Hospital,  known as the Office of Risk Management, which is located in the hospital itself, has since also affirmed that the defendant, Dr. John Persing, was their actual employee and not an independent contractor, as well did the Medical Staffing Office confirm that same master servant relationship.

In September of 2000, when the plaintiff, Lisa Egan, contacted the defendant, Dr. John Persing,  she was suffering from two separate and distinct medical conditions that were wholly separate and distinct from each other, and which bore no relation to each other, and which would each require a separate and distinct type of surgical procedure to correct them.

The plaintiff, Lisa Egan, was suffering from significant impairment to her visual field as a result of a condition known as ptosis, which necessitated that the excess skin above her eyelids be removed by a surgical procedure known as a Blepharoplasty, to restore her full visual field..

The plaintiff, Lisa Egan, was also suffering from significant impairment to her breathing as a result of a deviated septum caused by an impact in an automobile accident ten years earlier, which necessitated that the septum be repaired by a surgical procedure known as a Septoplasty, to restore her breathing to full capacity.

The plaintiff, Lisa Egan, sought to have the two separate procedures to correct the two separate medical ailments, performed on the same day  so that she would have to be put under general anesthesia only one time, and therefore avoid the unnecessary risk of having to be put under general anesthesia a second time at a later date.

The plaintiff, Lisa Egan's medical insurance did not allow for a later date, as the Cobra insurance awarded to the plaintiff as part of her Divorce award was due terminate in January of 2001, and the plaintiff, Lisa Egan, would no longer be covered by insurance after that date..

The plaintiff, Lisa Egan, met with the defendant, Dr. John Persing, for the first time on

4

October 23, 2000.

Prior to the actual surgery being performed on December 6, 2000, the plaintiff, Lisa Egan, engaged in five separate conversations and meetings with the defendant, Dr. John Persing, regarding different proposed treatments, the manner in which they would be performed, and the terms under which they would be consented to.

The five separate conversations which took place prior to the surgery were as follows:

1. two scheduled pre-op consultations which were held in the examination rooms of the Yale Plastic Surgery department

2. one unscheduled conversation which took place in the hallway of the Yale Physcians Building at the intersection of the causeway leading to the main portion of Yale-New Haven Hospital.

3. one unscheduled conversation in the office of the defendant, Dr. John Persing located in the Plastic Surgery Department of Yale-New Haven Hospital.

4. and one conversation that took place over the telephone, long distance.

The surgical procedures discussed during those five separate conversations were not the same for each conversation.

The subject of the Rhinoplasty, Septoplasty, and Blepharoplasty, the manner of their performance, and the terms under which they would be performed and consented to, were discussed at the two scheduled pre-op consultations held in the examination rooms of the Yale Physician Building, on October 23, 2000, and November 27, 2000.

On those two specific occasions, the defendant, Dr. John Persing, made representations as to the specific manner and method by which the Blepharoplasty, Rhinoplasty, and Septoplasty would be performed, and the plaintiff, Lisa Egan, believed and relied on those representations, a

5

a belief and reliance anticipated and deliberately induced by the defendant, Dr. John Persing, and a belief and reliance which the plaintiff, Lisa Egan, later suffered damage from.

On those two specific occasions, the defendant, Dr. John Persing also made promises regarding the terms under which the three separate procedures known as a Blepharoplasty, Rhinoplasty, and Septoplasty, would be consented to, and the plaintiff, Lisa Egan, believed and relied on those promises, a belief and reliance again anticipated and deliberately induced by the defendant, Dr. John Persing, and a belief and reliance which the plaintiff, Lisa Egan, later suffered detriment from.

The defendant, Dr. John Persing, did not inform the plaintiff, Lisa Egan, of any risks, side effects, or alternatives to the three procedures, known as a Blepharoplasty, Septoplasty, and Rhinoplasty.

On November 27, 2000, the defendant, Dr. John Persing, handed a Consent Form to the plaintiff, Lisa Egan, to sign, which had only the three named surgical procedures listed on it which had been discussed and assented to at that pre-op consultation appointment, those being the Rhinoplasty, Septoplasty, and Blepharoplasty.

The procedure referred to as a Brow Lift, or Forehead Lift, or Foreheadplasty, was not listed on the Consent Form, as it had not as of yet been meaningfully discussed or assented to.

The subject of the Brow Lift,  the manner of its performance, and the terms under which that procedure would be performed if consented to, were discussed in the three subsequent conversations which took place after the November 27, 2003, signing of the Consent Form to the Blepharoplasty, Rhinoplasty, and Septoplasty. .

On those three specific later occasions, the defendant, Dr. John Persing, made representations as to the insufficiency of a Blepharoplasty being performed alone without an

6

accompanying Brow Lift, and the lack of any alternative procedure to the Brow Lift, by which to cure the hooding of the plaintiff's visual field.

The defendant, Dr. John Persing, made representations as to the specific manner and method by which the Brow Lift would be performed, and the plaintiff, Lisa Egan, believed and relied on those representations, a belief and reliance anticipated and deliberately induced by the defendant, Dr. John Persing, and a belief and reliance from which the plaintiff, Lisa Egan, later suffered damage from.

The defendant, Dr. John Persing, also made promises regarding the terms under which the Brow Lift procedure would be consented to, and the plaintiff, Lisa Egan, believed and relied on those promises, a belief and reliance again anticipated and deliberately induced by the defendant, Dr. John Persing, and a belief and reliance which the plaintiff, Lisa Egan, later suffered detriment from.

The defendant, Dr. John Persing, knew when he made those representations and promises, as to the Brow Lift, that the representations and promises he was making were false.

The defendant, Dr. John Persing, induced the plaintiff, Lisa Egan's reliance on those representations and promises in order to obtain her Consent to the Brow Lift procedure, as he knew she would not consent to the Brow Lift under any other terms or conditions than the ones discussed and promised to her.

At no time in any of the conversations did the defendant, Dr. John Persing, inform the plaintiff, Lisa Egan, of any risks, side effects, or alternatives to the Brow Lift/Foreheadplasty.

The plaintiff, Lisa Egan, relying on the defendant, Dr. John Persing's representations and promises, gave her oral consent to the Brow Lift during the telephone conversation she had with the defendant, Dr. John Persing, long distance.

7

The plaintiff, Lisa Egan, never signed any written Consent Form for the Brow Lift, prior to, or subsequent to the performance of the Brow Lift/ Foreheadplasty.

On December 6, 2000, the plaintiff, Lisa Egan, went under general anesthesia, and was fully asleep and completely unaware of her surroundings and the state of her body.

The plaintiff, Lisa Egan believed, based on the representations of the defendant, Dr. John Persing, and what she had given her consent to, that she was about to have four separate surgical procedures performed on four separate parts of her face.

However, while the plaintiff slept, the defendant, Dr. John Persing, performed not four, but five separate and distinct surgical procedures on four separate and distinct portions of the plaintiff's face.  The fifth procedure being an extra but different Rhinoplasty procedure.

The four portions of the plaintiffs face that the defendant, Dr. John Persing, operated on in the course of his performance of the five separate procedures known as a Blepharoplasty, both Rhinoplastys, Septoplasty, and Brow Lift, were as follows:

1.  In his performance of the Blepharoplasty, the defendant, Dr. John Persing, operated on the plaintiff, Lisa Egan's eyelids.

2.  In his performance of the Septoplasty, the defendant, Dr. John Persing, operated on the plaintiff, Lisa Egan's septum.

3.  In his performance of two separate and different Rhinoplastys, the defendant, Dr. John Persing, operated on the plaintiff, Lisa Egan's nasal tip.

4.  In his performance of the Forehead Lift, the defendant, Dr. John Persing, operated on the plaintiff, Lisa Egan, Forehead and scalp.

During the course of the defendant, Dr. John Persing's performance of the five different

surgical procedures, he deliberately took surgical actions that were contrary to the plaintiff, Lisa

Egan's express wishes, deliberately took surgical actions on portions of the plaintiff, Lisa Egan,

face that he had no consent to operate on, and deliberately went beyond the scope of actions that

the plaintiff, Lisa Egan, had consented to, in the full knowledge that he was ignoring the plaintiff,

Lisa Egan's express wishes and desires, and that if she were awake she would have told him to

immediately stop what he was doing.

As to the Rhinoplasty, the defendant, Dr. John Persing, knew that he was <u>not </u>to perform

the Rhinoplasty on the tip of the plaintiff, Lisa Egan's nose <u>if </u>upon opening her up anything

unusual were to be found, or if he found that the operation would be more complicated than

anticipated, as the plaintiff, Lisa Egan, had expressly told him that he was <u>not</u> to go forward

under any unusual or complex conditions.

The defendant, Dr. John Persing, upon entering the plaintiff, Lisa Egan's nose,

immediately discovered a rare birth defect that he had not anticipated, a birth defect that was

extremely unusual and which was something he had <u>never personally seen or dealt with before</u>.

The defendant, Dr. John Persing, chose to go forward with the performance of the

Rhinoplasty anyway, and attempt to correct the birth defect, a defect and complication that he

knew the plaintiff, Lisa Egan, was completely unaware of when she gave her consent, and the

performance of which the defendant, Dr. John Persing,  knew was directly forbidden under the

terms of the plaintiff, Lisa Egan's consent obtained in the Yale Physicians Building  on

November 27, 2000, and listed on the defendant, Yale-New Haven Hospital's Consent Form.

The defendant, Dr. John Persing, in attempting to perform the Rhinoplasty under the new

condition of the unanticipated rare birth defect, was attempting to correct a condition that he

himself, though a highly experienced physician, had no personal experience dealing with before,

and which without experience, was experimental and radical attempt.

The defendant, Dr. John Persing, in attempting to perform the Rhinoplasty under the newly discovered condition of the rare birth defect, engaged in the operation that was much complex and risky, and which as a result, took two extra hours to perform.

The defendant, Dr. John Persing, in attempting to perform the Rhinoplasty under the newly discovered condition of the rare birth defect, was forced to perform a secondary Rhinoplasty, different in nature, distinction, and identification, than the Rhinoplasty originally consented to and anticipated.

The defendant, Dr. John Persing, knew that going forward with the Rhinoplasty under the new condition of the birth defect, rendered the procedure a completely different procedure, as it was one which was now being performed under completely different conditions than the one that the plaintiff, Lisa Egan, had consented to on November 27, 2000, and which entailed the performance of an extra procedure, that being the performance of a second Rhinoplasty

The defendant, Dr. John Persing's, knowledge of the change of plan midstream, is evidenced by the fact that the procedural code originally assigned to the anticipated Rhinoplasty procedure prior to the actual surgery on December 6, 2000, was not the only procedural code assigned to the Rhinoplasty  procedure after the completion of the Rhinoplasty operation.

Prior to the operation of December 6, 2000, the defendant, Dr. John Persing, assigned surgical procedural codes to each of the surgical procedures he intended to perform.  The surgical procedure codes identify the specific type and nature of surgical procedure to be performed, and are even used to indicate the specific differences in the manner in which surgical procedures that bear the same name are intended to be performed, which then render them entirely different procedures from each other.

10

Hospital procedure demands that the surgical codes be listed on the pre-op documents prior to the procedure being formed, and that the physician state on the Perioperateive Report, after the completion of the procedure, whether the procedures actually performed were the same as the codes and procedures that had been booked, in order to maintain a record of what was intended, and what was actually performed.

Prior to the operation on December 6, 2000, the Blepharoplasty was assigned the surgical procedure code of 15822.

The Blepharoplasty was listed and identified under that specific code of 15822 on the pre-op documents, and then billed under that same specific code to the insurance company after the operation.

Prior to the operation of December 6, 2000, the Septoplasty was assigned the surgical procedure code of 30520.

The Septoplasty was listed and identified under that specific code of 30520 on the pre-op documents, and then billed under that same specific code to the insurance company after the operation.

As the Brow Lift was not addressed or consented to until just days prior to the operation of December 6, 2000, reference to it is absent from any pre-op documents, and it was not assigned a surgical procedure code until the operation had already taken place.

At that time, the Brow Lift was assigned the surgical procedural code of 67900, and then billed to the insurance company under that specific surgical code..

The Rhinoplasty however, was assigned one specific surgical procedure code prior to the operation of December 6, 2000, and then assigned an additional surgical procedural code after the completion of the operation on December 6, 2000.

11

Prior to the operation on December 6, 2000, the Rhinoplasty was assigned the surgical procedure code of 30435, which indicated the specific type of Rhinoplasty that the defendant, Dr. John Persing intended to perform on December 6, 2000.

The Rhinoplasty was listed and identified under that specific code of 30435 on the pre-op documents, and in the defendant, Dr. John Persing's office documents..

But after the December 6, 2000 operation, the defendant, Dr. John Persing, listed and identified a second Rhinoplasty procedure as having been performed on the plaintiff, Lisa Egan, on December 6, 2000, along with the originally intended Rhinoplasty procedure.

The second and additional Rhinoplasty procedure is listed and identified by a different surgical procedure code than the first and originally intended Rhinoplasty procedure.

The second Rhinoplasty procedure is identified under the surgical procedure code of 30400, and that specific surgical procedure code identifies and defines that particular Rhinoplasty procedure as a completely different procedure from the first Rhinoplasty procedure.

Both of the separate Rhinoplasty procedures were then billed for by the defendant, Dr. John Persing, under both of their separate surgical procedure codes as distinctly separate operative procedures, being billed under both 30435 and 30400, to Blue Cross/Blue Shield of Connecticut, and then to the plaintiff.

As the defendant, Dr. John Persing, was now charging for two Rhinoplasty procedures instead of just the one originally consented to, the amount billed to the insurance company, and later to the plaintiff, Lisa Egan, ended up being double the amount originally anticipated and agreed to.

The defendant, Dr. John Persing, billed Bue Cross/Blue Shield, and the plaintiff, Lisa Egan, for the initial Rhinoplasty under the code of 30435, at a fee amount listed as $2,273.00.

12

At the same time, the defendant, Dr. John Persing, billed for the second unanticipated Rhinoplasty under the code of 30400, <u>at an additional fee amount</u> listed as $2,800.00

The defendant, Dr. John Persing, billed for the Septoplasty under the code of 30520, at a fee amount listed as $3,15700.

The total then, which the defendant, Dr. John Persing, ultimately billed to the insurance company and the plaintiff, under the three separate codes, those being 30434 and 30400 for the two separate Rhinoplastys, and 30520 for the Septoplasty, was a total fee amount of $8,230.00.

However, the amount originally agreed to be charged for the Rhinoplasty and Septoplasty, as listed in the defendant, Dr. John Persing's office notes, notes which were <u>written and faxed prior</u> to the performance of the Rhinoplasty and Septoplasty on December 6, 2000, is listed at being only $4,620.00

Therefore, the defendant, Dr. John Persing, on December 6, 2000, performed an <u>extra</u> surgical procedure on the plaintiff, Lisa Egan's nose, an <u>additional</u> and <u>wholly different</u> Rhinoplasty procedure than the one the plaintiff, Lisa Egan, consented to on November 27, 2000, a procedure which the defendant, Dr. John Persing, specifically identified as separate, and subsequently specifically billed for, a billing that admits he himself believed that he had performed two wholly different and separate Rhinoplasty procedures, <u>where only one was anticipated and consented to on November 27, 2000.</u>

The plaintiff, Lisa Egan, did not consent, and could not have consented to the second Rhinoplasty, a procedure she had no advance knowledge was to be performed, was not anticipating paying extra for, and which the defendant, Dr. John Persing, himself, was not even himself planning to do, until he discovered the rare birth defect, and attempting to go forward with the Rhinoplasty induced him to perform the additional procedure while the plaintiff, Lisa

13

Egan, slept unaware, and unable to consent to it.

The defendant, Dr. John Persing, during his performance of the Rhinoplasty, had full and complete knowledge that if the plaintiff, Lisa Egan, were awake and aware of what was being done to her, she would have immediately revoked her consent to the Rhinoplasty, and would have told the defendant, Dr. John Persing, to immediately stop what he was doing to her.

The defendant, Dr. John Persing's surgical actions were taken in deliberate, willful, reckless, and wanton contravention to the plaintiff, Lisa Egan's expressed desires, and right to decide what is and what is not to be done to her body..

As to the Forehead Lift, the defendant, Dr. John Persing, knew that the plaintiff, Lisa Egan, had expressly stated that she did not want the Forehead Lift performed if a scalloped or crenelated incision were to be used, like the one he shown her a picture of in the book..

The defendant, Dr. John Persing, knew that he had expressly promised the plaintiff, Lisa Egan, that he would not use a scalloped or crenelated in the performance of the Brow Lift.so that she would not be left with a scalloped or crenalated scar,   and that it was only upon that promise that the plaintiff, Lisa Egan, orally consented to the performance of the Brow Lift.

The defendant, Dr. John Persing, deliberately chose to perform the Brow Lift using a scalloped or crenalated incision anyway, in direct contravention to the plaintiff, Lisa Egan's expressed wishes, in direct contravention to his own promise, and the performance of which he knew was forbidden under the terms of the plaintiff, Lisa Egan's oral consent obtained over the telephone.

The defendant, Dr. John Persing's surgical actions were taken in deliberate, willful, reckless, and wanton contravention to the plaintiff, Lisa Egan's expressed desires, and her right to decide what is and is not to be done to her body..

14

Further, the defendant, Dr. John Persing, in his performance of the Foreheadplasty, operated on <u>other</u> portions of the plaintiff, Lisa Egan's face and head that <u>he had no consent</u> to touch, as the actions taken had never been disclosed to the plaintiff, discussed with the plaintiff, or consented to by the plaintiff..

In performing the Foreheadplasty, the defendant, Dr. John Persing, intentionally removed a significant amount of muscle tissue from the plaintiff, Lisa Egan's forehead, which he had absolutely <u>no consent, of any kind to remove</u>, muscle he removed for the purpose and intent of permanently hinder the plaintiff, Lisa Egan's ability to move the muscles of her face.

The taking of that muscle tissue was not only done without <u>any</u> written or oral consent, but further resulted in nerve damage to the plaintiff, Lisa Egan's forehead, and scalp, causing her to suffer not only an inability to move the muscles of her forehead, but to suffer a permanent numbness and tightness of her entire forehead and scalp.

Further, the defendant, Dr. John Persing, made lengthwise vertical incisions running down both side of the plaintiff, Lisa Egan's head almost to her ears, which he had <u>no consent, of any kind, to make.</u>

The making of those incisions was done without <u>any</u> written or oral consent, and resulted in large scars to the plaintiff, Lisa Egan's head and scalp, causing her to suffer visible lengthwise vertical scars running down the sides of her head nearly to her ears, and to suffer permanent baldness in the areas of the scar tissue, and where the scar tissue spread.

The defendant, Dr. John Persing, in his performance of the Foreheadplasty, had full and complete knowledge that if the plaintiff, Lisa Egan, were awake and aware of what was being done to her, she would have immediately revoked her consent to the Forehead Lift, and told the defendant, Dr. John Persing, to immediately stop what he was doing to her

15

Finally, the defendant, Dr. John Persing made fraudulent and intentionally misrepresentative statements to the plaintiff, Lisa Egan, in order to obtain the plaintiff, Lisa Egan's consent to the Forehead Lift.

The defendant, Dr. John Persing, knew when he promised not to make a scalloped or crenalated incision, that he had full intention of making a scalloped or crenalated incision, and only gave his promise not to make that type of incision in order to obtain the plaintiff, Lisa Egan's consent to the Forehead.

. The defendant, Dr. John Persing, also knew that the only reason the plaintiff, Lisa Egan, agreed to the Forehead Lift, was that the defendant, Dr. John Persing, had expressly told her that her visual field problem could not be cured without the Forehead Lift procedure being performed in conjunction with the Blepharoplasty, and there was no other alternative procedure to the Forehead Lift to effect that cure, a statement that the defendant, Dr. John Persing, knew was false when he made it, and which was made for the purpose of obtaining the patients consent to the Forehead Lift.

The defendant, Dr. John Persing, knew that he was misleading the plaintiff, Lisa Egan, as there was another procedure which is performed much more regularly which leaves very little scar, known as an Endscopic Lift which the plaintiff, Lisa Egan, certainly would have chosen if given the choice.

Finally, the defendant, Dr. John Persing, deliberately mislead the plaintiff, Lisa Egan, into believing that the Foreheadplasty was safe, and that it bore no material risks or side effects, as he fraudulently did not disclose any of the risks or side effects to that procedure, in order to obtain the plaintiff, Lisa Egan, consent to that procedure.

Therefore, the lack of consent issues in this suit which deal with the consent and

16

performance of the Rhinoplasty, are completely different than the lack of consent issues in this suit which deal with the consent and performance of the Foreheadplasty.

The  fact patterns of the Rhinoplasty  are completely different, and have completely different elements to prove, than those fact patterns, elements and issues relating to the Foreheadplasty.

The claims and legal issues surrounding the Rhinoplasty have to do with the defendant, Dr. John Persing, deliberately and intentionally <u>overstepping the consent</u> he was given by <u>performing a completely different, more complex, and riskier</u> operation than the operation originally anticipated or consented to by the plaintiff, Lisa Egan, and an additional procedure of a second Rhinoplasty, all with the full knowledge that he was performing that operation in direct contravention to the specific contingent terms under which the consent to the initial Rhinoplasty had been given, and without the plaintiff, Lisa Egan's consent..

The claims and legal issues surrounding the Forehead Lift have to do with the defendant, Dr. John Persing, <u>fraudulently misrepresenting</u> the manner and method he would use to perform the Foreheadplasty, <u>fraudulently concealing</u> the alternative method of an Endoscopic Lift, <u>fraudulent non-disclosure</u> of the risks and side effects to the procedure, committing  those acts of Fraud as a means to obtain the plaintiff's consent to the Foreheadplasty, intentionally performing <u>a much different operation than the one consented to</u>, intentionally using a scalloped or crenalated incision in direct contravention to the plaintiff, Lisa Egan's wishes, as well as in contravention to his own promises not to make that incision, intentionally removing the muscles in the plaintiff's forehead for the purpose of permanently maiming her ability move her face, and intentionally making incisions down the sides of her head, without <u>any</u> consent oral or written ever being given by the plaintiff, Lisa Egan.

17

Though the Blepharoplasty, Septoplasty, Foreheadplasty, and Rhinoplasty, all took place on December 6, 2000, for convenience sake, they did not take place simultaneously and are not one and the same procedure.

The five surgical procedures were billed for separately, under different surgical codes, and to different responsible parties depending on the medical procedure performed.

The Blepharoplasty was billed and covered by Blue Cross/Blue Shield of Connecticut The Septoplasty and both Rhinoplastys were both billed and partially covered by Amica Insurance Company.  Both Rhinoplastys were billed to Blue Cross/ Blue Shield of Connecticut, and after being denied, were billed to Lisa Egan.  The Brow Lift was billed and covered by Blue Cross/Blue Shield of Connecticut.

All five procedures were billed under separate codes as the procedures themselves are completely different and separate and involved operation on different and separate portions of the plaintiff, Lisa Egan's face and head, for different therapeutic and aesthetic purposes.

The five surgical procedures were identified and viewed by both the defendant, Dr. John Persing, the billing department of the defendant, Yale-New Haven Hospital, the billing department of the defendant, Yale University, the billing departments of Amica Automobile Insurance Company, and the billing department of Blue Cross/Blue Shield, as five distinct and separate surgical procedures or operations, though being committed on the same day.

The Rhinplasty(s) and the Foreheadplasty, the manner of their performance, the issues surrounding the consent given or not given to them individually, and manner by which that consent was obtained are what are at issue in this suit.

The determination on the issues pertaining to the Rhinoplasty can only be made by determining what the facts, conditions, and terms were during the discussions held between the

18

plaintiff, Lisa Egan, and the defendant, Dr. John Persing, prior to, and during her giving of her written consent to that procedure on November 27, 2000, and determining whether that consent allowed the defendant, Dr. John Persing, to take the specific actions he took relating to the Rhinoplasty on December 6, 2000.

The determination on the issues pertaining to the Blepharoplasty can only be made by determining what the facts, conditions, and terms were during the discussions held between the plaintiff, Lisa Egan, and the defendant, Dr. John Persing, prior to, and during her giving of her written consent to that procedure over the telephone, long distance on December 1, 2000, and determining whether that consent allowed the defendant, Dr. John Persing, to take the specific actions he took relating to the Blepharoplasty on December 6, 2000.

The other newly discovered issues involving Nurse Rosemary Asiedu's unauthorized and unsupervised administration of anesthesia, Dr. Gopal Grandhige's unauthorized surgical actions, Dr. Peter Atanassoff's failure to supervise Nurse Rosemary Asiedu, and subsequent fraudulent statement in the medical record, the defendant, Dr. John Persing's deliberate alteration of the medical records, and Dr. Gary Price's refusal to turn over portions of the plaintiff, Lisa Egan's record, give rise to separate and distinct causes of action, having within them their own distinct fact patterns and elements that also give render liability to the defendant, Yale-New Haven Hospital, Yale University, and the defendant, Dr. John Persing, also, though discovered only now due to prior fraudulent concealment of those issues.

## Legal Argument

### A.    Dismissal of Claims Against Yale-New Haven Hospital

If the defendant, Dr. John Persing, is in fact an employee of the defendant, Yale-New Haven Hospital, then the defendant, Yale-New Haven Hospital, is liable for the tortious acts he committed against the plaintiff, Lisa Egan, while acting in the scope of his employment.

Courts generally impose vicarious liability on hospitals for the malpractice of physician-employees under the theory of Respondeat Superior.

In Giusti v. C.H.Weston Co. (1941) 165 Or 525, 108 P2d 1010, the court stated that " The great weight of authority" supported "the salutary rule that persons and hospitals that treat patients for hire with the expectation and hope of securing there from gain and profit are liable for negligence and malpractice on the part of physician and nurses employed by them."

The court, in the landmark case of Bing v. Thunig (1957) 2 NY2d 656, 163 NYS2d 3, 143 NE2d 3, stated: " Hospitals shoulder the responsibility borne by everyone else. There is no reason to continue their exemption form the universal rule of Respsondeat Superior. The test should be for these institutions whether charitable or profit-making, as it is for every other employer, was the person who committed the negligent injury-producing act one of its employees, and if he was, was he acting within the scope of his employment." see also Morwin v. Albany Hospital (1959) 7 App Div 2d 582, 185 NYS2d 85; Scott v. Brooklyn Hospital, 125 Misc. 2d 765, 480 N.Y.S. 2d 270 (1984); Smock v. Brantley, 76 N.C. App. 73, 331 S.E.2d 714 (1985); Rural Educational Assoc. V. Bush (1956) Tenn App. 298 SW2d 761.

If the defendant, Dr. John Persing, is not in fact an employee of the defendant, Yale-New Haven Hospital, then the defendant, Yale-New Haven Hospital, may still be held liable for the tortious acts committed against the plaintiff, Lisa Egan, by the defendant, Dr. John Persing, under the doctrine of Ostensible Agency.

Where a hospital can be found to have "held out" to the prospective patient that medical treatment is to be administered by a doctor employed therein, liability for its physician's negligence may be imposed on the hospital under the doctrine of Respondeat Superior even though for other purposes and other contexts, the physician would be regarded as an independent contractor in relation to the hospital.

An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him, and when there is nothing that should have put the patient on notice that the physician was not an employee of the defendant hospital.  Seneris v. Haas (1955) 45 Cal 2d 811, 291 P2d 915, 53 ALR2d 124.

This doctrine is summarized in the Restatement Second of Agency § 267  (1958):

> "One who represent that another is his servant or her agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if her were such.
>
> The three element which must be proved in order to prevail in an action against a hospital for the malpractice of an independent contractor physician based upon ostensible agency are:
>
> 1. a justifiable belief by the patient that the physician is the hospitals agent
> 2. which arose from a representation by the hospital and
> 3. which

21

This approach is also consistent with the Restatement Second of Torts § 429 (1966):

> "One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by this servant."

In particular, Ostensible Agency has been used to hold hospitals liable for the acts of physicians with hospital-based practices in the following cases:  Quintal v. Laurel Gove Hosp. 41 Ca. Rptr. 577, 397 P.2d 161 (Cal. 1964);  Seneris v. Haas, 291 P.2d 915 (Cal. 1955);  Hippocrate Mertsaris. V. 73rd Corp.  105 A.D.2d 67, 482 N>Y>S.2d 792 (1984);  Stratso v. Song, 17 Ohio App. 3d 39, 477 N.E.2d 1176 (1984);  Thomas v Raleigh General Hospital, 358 S.E.2d 222 (W.Va.1987)

In Rural Education V. Bush (1956)  Tenn App 298 SW2d 761  The court, noting the rule of law that a principal is bound if an agent acts within his apparent or ostensible authority, though the testimony was that the surgeon who operated on the plaintiff was an independent surgeon and that plaintiff was his private patient, the court found sufficient evidence to support the finding by the jury that the surgeon  was the agent of defendant hospital at the time of the operation on the following facts:

The operating surgeon was on the resident staff of the defendant hospital, such staff consisting of physician who had offices in the hospital buildings, and who render medical and surgical services to patients of the hospital who had no private physician; plaintiff had no private physician and was referred to the medical director, who in turn referred him to the operating surgeon; plaintiff did not know any of the doctors who examined or treated him and thought of them as the Madison Sanitorium Hospital doctor, the quoted phrase constituting the name of the

hospital operated by the defendant.

In the present case, the facts are that the defendant, Dr. John Persing, was on staff as the Chief of Staff of Plastic Surgery at Yale-New Haven Hospital, that he maintained his office in the Plastic Surgery Department of Yale-New Haven Hospital, that the sign in the lobby of the Plastic Surgery Department lists the defendant, Dr. John Persing, as Chief, that his office is located in the hospital building named Yale Physicians Building, that the Yale Physicians Building appears to be just another part of Yale-New Hospital, that the plaintiff, Lisa Egan had no private physician, that the plaintiff, Lisa Egan, was referred to the defendant, Dr. John Persing, by the defendant, Yale-New Haven Hospital, that his office is accessed by telephone through the defendant, Yale-New Haven Hospital's switchboard as being in the Plastic Surgery Department, that no one on the switchboard or in the Plastic Surgery Department ever informs the caller that they are now not speaking to Yale-New Haven Hospital employees or physicians, and that the faxes that come from the defendant, Dr. John Persing's office have the heading and title of Yale Plastic Surgery printed on them.

In Brown v. Moor (1957, CA3 Pa) 247 F2d 711, 69 ALR2d 288, cert den 355 US 882, 2 L ed 2d 112, 78 S Ct 148, a hospital was found to have ostensible liability on the fact that the physician's office record was headed "The Mercer Sanitorium", and on the form and language of the bill rendered by defendant for treating the decedent.

In the present case, the faxes sent from the defendant Dr. John Persing's office fax machine, and the fax cover letters, both state that they come from "Yale Plastic Surgery". (see Exhibits and B. Further, the defendant, Yale-New Haven Hospital collected their own fees themselves in the amount of $11,098.01, from the plaintiff, Lisa Egan's insurance company, for the surgical procedures that the defendant, Dr. John Persing, performed on December 6, 2000.

23

When the patient seeks care directly from the hospital, the courts have utilized the doctrine of apparent or ostensible authority to hold the hospital liable for the malpractice of an independent contractor in the following cases: Vananman v. Milford Memorail Hospital, Inc. 272 A.2d 718 (Del. 1970) , Hardy v. Brantley, 471 So. 2d 358 (Miss. 1985), Arthur v. St. Peter's Hospital, 169 NJ. Super. 575, 405 A2d 443 (1979); Mduba v. Benedicitn Hospital, 52 A.D.2d 450, 384 NYS. 2d 527 (1976); Capan v. Divine Providence Hospital, 169 Pa. Super. 364 430 A2d 647 (1980); Edmonds v. Chamberlain Memorial Hospital, 629 S.w.2d 28 (Tenn. Ct. App. 1981); Aamski v. Tacoma General Hospital, 20 Wash. App. 98, 579 P.2d 970 (1978)

In addition, the court held in Arango v. Rayka, 507 So. 2d 1211 (Fla. Dist. Ct. App. 1987) that a hospital can be held vicariously liable for malpractice on the part of member of the Physician Group which it has established a Joint Venture relationship with.

Therefore, the defendant, Yale-New Haven Hospital,  can be held liable under the doctrine of Joint Venture, given the closeness of the relationship it maintains with the defendant, Dr. John Persing and the other physicians of the Yale Plastic Surgery Department, whether they are direct employees or not,  given  the amount of transactions and actions in concert between the physicians and the defendant, Yale-New Haven Hospital,  and the number of indicators that lead the common and reasonable man  to believe that the Yale Plastic Surgery Department and the defendant, Yale-New Haven Hospital,  are operating together as one business.

The defendant, Yale-New Haven Hospital,  is also liable under the doctrine of Respondeat Superior for the tortious acts committed by the other medical personnel and physicians who were involved in the plaintiff, Lisa Egan's care, who were themselves directly employed by the defendant, Yale-New Haven Hospital.

In Moeller v. Hauser (1952) 237 Minn. 368, 54 NW2d 639, 57 ALR2d 364  the Court

24

stated that the relationship of a "resident to the hospital is not unlike that of an intern or nurse, since all three groups are specially and highly trained, all three are engaged in supplying the element of trained medical care which distinguishes a hospital from a hotel, and that under such circumstances it must be held that a resident doctor in a hospital who receives his compensation from the hospital while providing medical care as part of regular hospital routine is a servant to the hospital as to make the hospital liable for his negligence under the doctrine of Respondeat Superior."

In Bowers v. Olch (1953) 120 Cal App 2d 108, 260 P2d 997, the court, in holding that the doctrine of Res Ipsa Loquitur could be invoked in the present suit as against the hospital, pointed out that the physician in question was a resident surgeon employed and paid by the hospital, and added "A hospital is liable for the negligence of its employees in caring for a patient in the hospital."

Dr. Gopal Grandhige, the medical resident who assistant the defendant, Dr. John Persing, during the operation on the plaintiff, Lisa Egan, without her consent, was an employee of the defendant, Yale-New Haven Hospital.

Nurse Rosemary Asiedu, who administered the anesthesia unsupervised, without the legal authority or skill to do so, and who also allowed herself to be listed as a doctor on the medical record, was and still is an employee of the defendant, Yale-New Haven Hospital, .

Dr. Peter Atanassoff, who failed to supervise the administering of the anesthesia, and who falsely swore to being present during that administration of the anesthesia, was and still is an employee of the defendant, Yale-New Haven Hospital.

The actual employment status of the defendant, Dr. John Persing, does not insulate the defendant, Yale-New Haven Hospital, from liability either, as the doctrine of the Borrowed

Servant does not protect them from being held responsible for the acts of their own employees.

In <u>Brickner v. Normandy Osteopathic Hospital</u>, Inc. 746 S.w.2d 108 (Mo. Ct. App. 1988) the defendant hospital was liable for the negligence of a resident even though the resident was under the supervision and control of the physician.

The Borrowed Servant doctrine only determines if the defendant, Dr. John Persing, is also himself liable for the acts of Dr. Gopal Grandhige, Nurse Rosemary Asiedu, Dr. Peter Atanassoff.

In <u>Ybaarra v. Spangard</u>, 25 Cal. App. 3d 66, 211 Cal. Rptr. 445 (1985) the court stated that assisting physician and nurses normally become temporary servants of the surgeon in the operating room.

The determinative factors in ascertaining whether an independent contractor physician is liable for the acts of hospital employees is the presence of the physician at the time of the negligence, and the opportunity to direct or control the act of the employee.

The court stated in <u>Young v. Carpenter</u>, 694 P.2d 861 (Colo. App. 1984) that a surgeon may be held liable for the negligence of hospital employees under his supervision and control during surgery.

In the present case, the defendant, Dr. John Persing, was in the operating room at the time when both Dr. Gopal Grandhige and Nurse Rosemary Asiedu committed their tortious acts, and the defendant, Dr. John Persing, had complete knowledge of and control over those tortious acts because those acts were committed at the defendant, Dr. John Persing's, request and command, and under his direct instruction and supervision.

With regards to the defendant, Dr. John Persing's liability for the acts of Dr. Gopal Grandhige, the court stated in <u>Johnson v. McMurray</u>, 461 So. 2d 798 (Ala. 1984) that liability

26

can be found <u>where a physician uses assistants contrary to the express wishes of the patient</u>.

In the present case, the defendant, Dr. John Persing, consciously and deliberately chose to use a medical resident assistant, Dr. Gopal Grandhige, and completely ignore and violate the wishes of the plaintiff, Lisa Egan

The plaintiff, Lisa Egan, had expressly stated to the defendant, Dr. John Persing, several times, that she <u>absolutely refused to have</u> any medical residents assist him or touch her in any way, as this was her face, and not some unseen portion of the body that would not visibly reflect their inexperienced attempt at work.

The plaintiff, Lisa Egan, expressly told the defendant, Dr. John Persing, that she had come two hundred miles to have <u>only</u> him work on her, as he was reputed to be the best that the hospital had, and she wanted the care of her body and her face to be only in his surgical hands.

The defendant, Dr. John Persing, in response to the plaintiff, Lisa Egan's stated wishes, expressly promised the plaintiff, Lisa Egan, that he would <u>not</u> allow any medical residents to assist him, a promise he obviously knew he had no intention of keeping when he made it, but which he intended the plaintiff, Lisa Egan, to rely on.

In breaking his own express promise to absolutely not let any medical residents touch the plaintiff, Lisa Egan, and ignoring the plaintiff, Lisa Egan's right to decide who is and who is not allowed to touch her, the defendant, Dr. John Persing, deliberately authorized an intentional Assault and Battery on the plaintiff, Lisa Egan, and vitiated the consent previously given to all four procedures, as it was obtained by fraud, and deliberately overstepped.

With regards to the defendant, Dr. John Persing's liability for the acts of Nurse Rosemary Asiedu, the court held in <u>Foster v. Englewood Hospital Assoc.</u> 19Ill. App. 3d 1055, 313 N.E. 2d 255 (1974). that where the physician had <u>direct control over a nurse anesthetist</u> he was found

27

liable for her negligence.

Nurse Rosemary Asiedu administered anesthesia without legal authority, skill, or appropriate supervision, and it was the defendant, Dr. John Persing, who told Nurse Rosemary Asiedu to begin administering the anesthesia without the anesthesiologist, Dr. Peter Atanassoff, being present to supervise that administration of anesthesia.

In Boyd v. Bulala 647 F.Supp. 781 (Va. 1986) the court held that liability could be imposed where nurse followed physicians instruction and not hospital policy, thus permitting an inference that the nurse was an agent of the physician.

In Stahlin v. Hilton Hotels Corp. 484 F.2d 580 (7th Cir. 1973) a physician was held liable where he allowed an unlicensed nurse to perform duties permitted under Maryland law only to licensed physicians. Delany v. Rosenthal, 347 Mass. 143, 196 N.E.2d 878 (1964)

In Miller v. Atkins, 142 G. App. 618, 236 S.E. 2d 838 (1977) it was held that a surgeon may be liable for the negligence of a nurse who is subject to his immediate personal supervision.

As to Dr. Peter Atanassoff's failure to be present at the time that Nurse Rosemary Asiedu administered anesthesia to the plaintiff, Lisa Egan, and his fraudulent signing of the medical record stating that he was present and supervising her when he was not, he is liable for his own intentional tort and Malpractice, and also liable for the acts of Nurse Rosemary Asiedu.

In Wiles v. Myerly, 210 N.W. 2d 619 (Iowa 1973) the court held that an anesthesiologist could be liable for acts of temporary assistant while performing the duty owed to the patient regardless of whether he paid or employed them.

Vicarious Liability can be imposed on a physician for the torts of other physicians where there are multiple physician providing care to the same patient, therefore the defendant, Dr. John Persing, is liable for the acts of Dr. Peter Atanassoff, and Dr.Gopal Grandhige, regardless of what

28

his employment status is to the defendant, Yale-New Haven Hospital.

Therefore, if the defendant, Yale-New Haven Hospital, is found to be liable under the doctrine of Ostensible Agency for the acts of the defendant, Dr. John Persing, then by extension, they are also liable for all acts committed under the defendant, Dr. John Persing's supervision, by all actors, whether in the defendant, Yale-New Haven Hospital's direct employ or not.

A Non-Delegable Duty rationale has also been used to hold a hospital vicariously liable for the torts of an independent contractor

In <u>Jackson v. Power,</u> 743 P.2d 1376 (1987) the Supreme. Ct. of Alaska  held a hospital vicariously liable as a matter of law under a Non-Delegable Duty rationale for negligent health care.  The court stated that the hospital was obligated <u>under JCHO standards and its own bylaws</u> to provide appropriate health care, and that " a Hospital ... may not shield itself from liability by claiming that it is not responsible for the results of negligently performed heath care when the law imposes a duty on the hospital to provide that health care"

Hospitals have also been held liable for failing to exercise reasonable care in supervising and reviewing a staff physician. <u>Fiorentino v. Wagner,</u> 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296 (1967); <u>Felice v. St. Agnes Hospital,</u> 65 A.D.2d 388, 411 Y.Y.S. 2d 901 (1978);

In <u>Carling v. Charleston Memorial Hospital</u> 33 Ill. 2d 326, 211 N.E.2d 253 (1965) cert. Denied, 383 U.S. 946 (1966) the Illinois Supreme Court upheld a jury verdict against a hospital for injury resulting from the care proved by a non employee physician on its medical staff.  The Darling court could have used the doctrine of Ostensible Agency to hold the hospital liable, it instead held that the hospital had <u>an independent duty owed directly to the patient to prudently select, review, and monitor its medical staff</u> . (see also <u>Corleto v. Shor Mem. Hosp.,</u> 138 N.J. Super. 302, 350 A2d 534 (1975); <u>Martel v. St. Charles Hosp.,</u> 523 N.Y.S.2d 342 (Sup. Ct. 1987);