Blanton v. Moses H. Cove Memorial Hosp, Inc. 319 N.C. 372, 354 s.eE.2d 455 (N.C. 1987);

Thompson v. Nason Hosp., 535 A.2d 1177 (Pa. Super.Ct.1988); Fridena v. Evans, 127 Ariz. 516,

622 P.2d 463 (1980).

Finally, the Borrowed Servant rule does not relieve the hospital of liability for the

administrative or clerical acts of its employees Elam v. College Park Hospital. 132 Cal. App. 3d

332, 183 Ca. Rptr. 156 (1982)

The rationale of Corporate Negligence was applied in Pedroza v. Bryant, 101 Wash. 2d

226, 677 P.2d 166 (1984) when the Washington Supreme Court noted that plaintiff is relying

solely on the doctrine of Corporate Negligence, which differs from Respondeat Superior in that it

imposes on the hospital a non-delegable duty owed directly to the patient, regardless of the

details of the doctor hospital relationship.

Hospitals have a duty to keep medical records of patients and to use reasonable care in

maintaining and protecting them properly.  That obligation is statutory and imposes a duty on the

institution not to lose or destroy records within a certain length of time.  These statutes are

designed not only for the benefit of the patient in receiving subsequent medical care, but also to

prevent the loss of evidence that may be essential to the pursuit or defense of a medical

malpractice claim

In Rodgers. V. St. Mary's Hosp. Of Decatur, 149 Ill. 2d 302, 597 N.E.2d 616 (1992)

the court held that a hospital's breach of this statutory duty is prima facie evidence of negligence

and gives rise to a cause of action by a patient who, because of the loss of such evidence, is

unable to obtain a verdict in a malpractice action.

The record as a whole is a collection of forms and papers on which facts are recorded,

respectively, by the attending physician, intern, resident, consultant, specialist , technician or

nurse. It represents, in short, a running factual commentary of the patient physical, mental and social condition and related treatment during his or her stay in the hospital. <u>Schendel v. Hennepin County Med. Ctr.</u>, 484 N.W.2d 803 (Minn. App. 1993)

In <u>Mucciolo v. Fernandez</u> 195 A.d.3d 623, 599 N.Y.S.2d 757 (1993) the court stated that a medical record that fails to convey objectively "meaningful medical information " to other physicians <u>is not</u> an adequate record.

This has been applied to patients charts being incomplete in <u>Smith v. St. Therese Hosp</u>, 106 Ill. App. 3d 268, 62 Ill. Dec. 141, 435 N.E.2d 939 (1982)

In <u>Bost v. Riley</u>, 44 N.C. App. 638, 262 S.e. 2d 391 (1980) it was held that a hospital violated its duty to patient <u>in not taking action against surgeons</u> for failing to keep progress notes.

The defendant, Yale-New Haven Hospital,  owes a duty to its patients, and to the plaintiff, Lisa Egan, to maintain and protect accurate medical records, and to protect them from harm, destruction, or alteration.  That duty is not only statutory, but well established under the defendant, Yale-New Haven Hospital's own policies, rules, regulations, and bylaws.

It is also a duty that the defendant, Yale-New Haven Hospital, owes under the JCHO Accreditation Standards, in order to keep its accreditation and continue to receive federal funds for Medicaid and Medicare.

<u>Physicians and nurses who deliberately alter medical records risk disciplinary actions and possibly misdemeanor charges.</u>

Liability has been imposed for surgeons found guilty for altering a patients medical record in <u>Moskovitz v. Mt. Sinai Medical Center</u>, 169 Ohio St. 3d 638, 635 N.E.2d 331 (1994) and in <u>McNamara v. Honeyman</u>, 406 Mass. 43, 546 N.E.2d 139 (1989)

It is a violation of the accepted standards of medical practice to erase and write over a

pre-operative note made by another physician. <u>State Bd. Of Med. Examiners v. McCroskey</u>, 880 P.2d 1188 (Colo. 1994).

A physician, when adding an entry to a patient's medical records days or weeks after the event, may not backdate the entry to the date of the event. To do so is a violation of the defendant, Yale-New Haven Hospital's own policies, rules, and regulations, and does not meet up to the JCHO Accreditation Standards.

Liability has also been imposed against hospitals when they were found to have attempted to cover information in the medical record by doctoring the records. <u>Convalescent Servs., Inc. V. Schultz,</u> 921 S.W.2d 731 (Tex. App. 1996), and in <u>McNamara v. Honeyman,</u> 406 Mass. 43, 546 N.E.2d 139 (1989)

In the present case, the defendant, Dr. John Persing, the defendant, Yale-New Haven Hospital, and the defendant, Yale University willfully and deliberately altered the medical record to protect themselves from liability.

The defendant, Dr. John Persing, when he found out that he was going to be sued, altered the contents of the October 23, 2000 pre-op note, not knowing that the plaintiff, Lisa Egan, had already obtained a copy of the original from the defendant, Yale-New Haven Hospital's Medical Record Department, the alteration of which constitutes Fraud.

Further, the defendant, Dr. John Persing, when he found out he was going to be sued, created post-op notes that did not exist prior to that time, as they had not previously been in the medical record which the plaintiff, Lisa Egan, had already retrieved from the defendant, Yale-New Haven Hospital's Medical Records Department, notes which were then backdated to appear to have existed earlier.

The contents and information in those post-op notes is fraudulent, and was written by the

defendant, Dr. John Persing, for the sole purposes of protecting himself from liability and hindering the plaintiff, Lisa Egan's ability to seek remedy for the wrongs he had committed to her.

Both the backdating of those notes and the writing of those notes constitutes Fraud.

On the Perioperative Form, the defendant, Dr. John Persing, failed to disclose that there had been any complication during the procedures performed on December 6, 2004.

Under the defendant, Yale-New Haven Hospital's own policies, rules and regulations, and under JCHO Accreditation Standards, the defendant, Dr. John Persing, had a duty to disclose the occurrence of any complication or mishap, and a further duty to fill out the Perioperative Form truthfully and accurately.

On the Perioperative Form, the defendant, Dr. John Persing, checked the box "no" as to whether there had been any complications during the procedures performed that day, though the defendant, Dr. John Persing, fully knew that the Rhinoplasty had turned out to be extremely complex, resulting in the operation lasting two hours longer than expected or anticipated, and which necessitated and entailed an extra, separate, and different Rhinoplasty surgical procedure being performed besides the one that he had initially booked to be performed.

On that same Perioperative Form, the words "same as booked" were hand written as referring to the procedures that were performed. The defendant, Dr. John Persing, however, knew that the extra and additional Rhinoplasty procedure was added on due to the complexity of the unanticipated birth defect, and therefore, the addition of that procedure did not in any way render the procedures performed to be in actuality the "same as booked".

Before the December 6, 2000 operation, there was only one Rhinoplasty procedure scheduled, booked, and listed on the pre-op documents, that being a particular type of

33

Rhinoplasty identified by the surgical procedure code of 30435, yet after the December 6, 2000 surgery, the defendant, Dr. John Persing, billed the plaintiff, Lisa Egan's insurance company for <u>not just the 30435 procedure</u>, but for <u>an additional and different type of Rhinoplasty procedure known under the surgical procedure code of 30400</u>, which then <u>doubled the cost</u> of the operation from the <u>agreed upon and anticipated price that had been quoted prior to the operation.</u>

Therefore, checking the box "no" as to complications, and writing the words "same as booked" was an attempt on the part of the defendant, Dr. John Persing, to conceal that he had overstepped the consent of the plaintiff, Lisa Egan, and that anything adverse had occurred during the operation.

That amounts to an act of fraudulent concealment.

.     Further, on the same Perioperative Form, the nurse referred to as Nurse Rosemary Asiedu, who administered the anesthesia to the plaintiff, Lisa Egan, without legal authority and without the supervision of an anesthetist, was listed and identified as Dr. Asiedu.

And on the Operative Report itself, the defendant, Dr. John Persing, <u>left blank</u> the portions where he had a duty to disclose the <u>name of any assistant</u> he used, and the <u>name of the Anesthesiologist</u> that was used.

Even if the defendant, Yale-New Haven Hospital,  and the defendant, Yale University can attempt to escape liability as direct tortfeasors in the acts of fraud and fraudulent concealment named above, they can still be held liable under the doctrines of Corporate Negligence, and Non- Delegable Duty, for failure to safely and adequately maintain and protect the plaintiff, Lisa Egan's record, and to ensure that mechanisms are in place to prevent or at least minimize a physicians ability to commit acts of fraud and fraudulent concealment.

Lastly, the defendant, Dr. John Persing, the defendant, Yale University, and the defendant, Yale-New Haven Hospital, deliberately conspired with another surgeon, one Dr. Gary Price, to prevent the plaintiff, Lisa Egan, from obtaining that portion of her medical records which was in the possession of Dr. Gary Price.

Dr. Gary Price is a plastic surgeon in private practice, who is an independent contractor physician with hospital privileges at Yale-New Haven Hospital, and who is also on the faculty staff of the defendant, Yale University.

At the time of the events about to be related, the plaintiff, Lisa Egan, did not know that Dr. Gary Price was on the faculty staff the defendant, Yale University's School of Medicine, but only knew Dr. Gary Price to be loosely connected to the defendant, Yale-New Haven Hospital, in that he regularly performed surgery there.

Due to the negative outcomes resulting from the December 6, 2000 operation, the plaintiff, Lisa Egan, went to see Dr. Gary Price at his office in the spring of 2001.

Dr. Gary Price's office is located in Guilford, Connecticut.

The plaintiff, Lisa Egan, had first met Dr. Gary Price five years earlier, back in 1994, when she went to see him at the same Guilford Office regarding the damage to her nose from the automobile accident. At that time, the plaintiff, Lisa Egan, was living in Connecticut, and had heard of Dr. Gary Price through local sources.

When the plaintiff, Lisa Egan, saw Dr. Gary Price, it was to have him assess the status of her face, and to ask his opinion as to what, if anything, could be done to undo the damage done to her nose, forehead and scalp, by the defendant, Dr. John Persing, and how risky any attempt to undo that damage would be.

Dr. Gary Price, during that office visit, examined the plaintiff, Lisa Egan's face, and the

35

work of the defendant, Dr. John Persing, and made specific statements directly to the plaintiff, Lisa Egan, regarding the work that was done, and the results, and regarding the skills and reputation of the defendant, Dr. John Persing, being below standard, and being known to be below standard.

Dr. Gary Price, told the plaintiff, Lisa Egan, that he had worked with the defendant, Dr. John Persing, on a number of occasions at "Yale".

The plaintiff, Lisa Egan, not knowing of Dr. Gary Price's affiliation with Yale University School of Medicine, assumed that Dr. Gary Price was referring to Yale-New Haven Hospital where she knew he regularly performed surgery.

At that appointment, Dr. Gary Price said he could try to remedy some of the damage done to the plaintiff, Lisa Egan, in one year, after the plaintiff, Lisa Egan was fully healed, and after the plaintiff, Lisa Egan had time to emotionally heal from what had happened to her.  Dr.Gary Price told the plaintiff, Lisa Egan,  to come back to see him in six months.

Though the plaintiff, Lisa Egan, had later contact again with the office of Dr. Gary Price, and  surgery was scheduled at that point for, she did not follow through with it due to personal and administrative conflicts that had arisen at that time.

Then on October 7, 2003,  the plaintiff, Lisa Egan, phoned Dr. Gary Price's office again, long distance from Pennsylvania, in order to made another appointment to meet with Dr. Gary Price so that he could re-assess the status of her face, and discuss the risks and probabilities of success or failure now that her face had healed.

Dr. Gary Price's office gave the plaintiff, Lisa Egan, several dates to choose from , all of which were within the next few weeks, and the plaintiff, Lisa Egan, chose one less than two weeks away.

During that phone call, the plaintiff, Lisa Egan, asked that a copy of the examination notes from the previous appointment back in 2000 be sent to her, so that she could evaluate her situation more clearly prior to the upcoming appointment.

The office staff, while on the telephone with the plaintiff, Lisa Egan, went and found her file, and stated that they were holding the file and saw the examination notes in the file.

When the question arose as to whether the examination notes were in an understandable format, or whether they would have to be transcribed into a letter format, the staff read out loud to the plaintiff a portion of the examination note in the file, to which the plaintiff, Lisa Egan, stated she would take the notes in their present format, though of course a letter would be easier if it were not too much trouble.

The office staff then stated that, either way, it would be no problem to send the examination notes to the plaintiff, Lisa Egan, so that she could go over them prior to the visit, and that they would just check with Dr. Gary Price as to whether he wanted to dictate the notes in a letter format before having them sent out.

The office staff then gave the plaintiff, Lisa Egan, their fax number for her to fax her authorization to them for the release of her records.

The plaintiff, Lisa Egan, then faxed a letter to Dr. Gary Price's office that same day, indicating that she had given her complete authorization for release of the medical records, and formally requesting a copy of Dr. Gary Price's examination notes.

Because of a problem with the fax machine, the plaintiff, Lisa Egan, had two more short conversations with the office staff on that same day, until her fax was finally received by them.

The plaintiff, Lisa Egan, called their office back to ask if they had actually finally received her authorization, to which they stated that they had.

37

When the medical records didn't arrive, the plaintiff, Lisa Egan, phoned the office of Dr. Gary Price once more, and the staff told her that they just hadn't gotten around to sending them out yet, but that they would send them out right away.

Several days later, the Dr. Gary Price's office phoned the plaintiff, Lisa Egan, and told her that they needed to cancel her appointment as an emergency had come up. When the plaintiff, Lisa Egan, tried to reschedule, the office repeatedly stated that Dr. Gary Price would not have any time for at least four months, saying that they didn't know when they would be able to give the plaintiff, Lisa Egan, an appointment.

The plaintiff, Lisa Egan, then pressed for a date four months away anyway, to which she was finally given one.

When the plaintiff, Lisa Egan, then went on to ask when it was that the office would be sending her a copy of her medical record, as she still had not received the examination notes, the staff said they didn't remember anything about any request for her medical record, and that they had never seen her file.

The plaintiff, Lisa Egan, then reminded them of the content of their previous telephone conversations, and that they had not only held the file in their hand but had even read to the plaintiff, Lisa Egan, from an item in that file.

The staff's response was to transfer the plaintiff, Lisa Egan, to three different people, all of whom stated that they didn't remember any file, didn't remember her request for the items in the file, and didn't know where her file was now or if it even still existed.

The plaintiff, Lisa Egan, then stated that they had a legal duty to honor her request for her the items in the file, and that they were required by law to give her a copy of the examination notes, as they were her medical record, to which the office staff told her that they would have to

get back to her.

Several days later, the office administrator phoned the plaintiff, Lisa Egan, and told the plaintiff, Lisa Egan, that she and Dr. Gary Price had sat down together and gone over the plaintiff, Lisa Egan's, file, and that after reassessing the contents of Dr. Price's notes, that Dr. Gary Price did not feel that there was anything that he would be willing to do for the plaintiff, Lisa Egan.

The administrator then went on to inform the plaintiff, Lisa Egan, that her request for her medical records was being denied, and that she would not be receiving them.

When the plaintiff, Lisa Egan, asked why, the administrator told the plaintiff, Lisa Egan, that the examination notes were the property of Dr. Gary Price.

In response, the plaintiff, Lisa Egan, informed the administrator that she was entitled to her medical records by law, and that to refuse her request was a violation of law.

The administrator however, then told the plaintiff, Lisa Egan, that Dr. Gary Price had been informed by his attorney that he was under no obligation to turn over the examination notes to the plaintiff, Lisa Egan, since the original appointment had been a complimentary one.

The Connecticut Health Department however, who determines the duty that physicians owe to their patients, and their obligations under the law, has assured the plaintiff, Lisa Egan, that she is legally entitled to those medical records, and that to withhold them is a violation of law, to which they then faxed the plaintiff, Lisa Egan, a copy of the exact law they were referring to.

The plaintiff, Lisa Egan, never received her medical records from Dr. Gary Price, records that indicate what he thought, six months post-op, of the work done by the defendant, Dr. John Persing, to the plaintiff, Lisa Egan's face.

Not until this past spring did the plaintiff, Lisa Egan, learn, by searching the Yale University site on the internet, that Dr. Gary Price is on the faculty and payroll of the defendant, Yale University, right along with the defendant, Dr. John Persing, and that the defendant, Dr. John Persing, is his superior.

Therefore, Dr. Gary Price's illegal withholding of the plaintiff, Lisa Egan's medical record was an effort to protect his employer, the defendant, Yale University, his superior, the defendant, Dr. John Persing, and the defendant, Yale-New Haven Hospital, from liability.

Punitive damages have been awarded for a physician willfully and wantonly withholding a patient's medical records to avoid a malpractice claim,  Rodgers v. St. Mary's Hosp. O Decatur, 198 Ill. App. 3d 871, 556 N.E.2d 913 (1990), and those punitive damages are attributable to institutions if it can be shown or believed that they or their attorneys had anything to do with the withholding.

Dr. Gary Price himself had no liability as to the events of December 6, 2000, and therefore no reason to withhold the examination notes, and violate the law, except to aid and abet the defendant, Yale University, the defendant, Dr. John Persing, and the defendant, Yale-New Haven Hospital, in their attempt to thwart the plaintiff, Lisa Egan, from being able to prosecute this case.

Under the above facts, the defendant, Yale-New Haven Hospital, the defendant Yale University, and the defendant, Dr. John Persing, can be held liable for both the acts of Dr.Gary Price, and for their own acts as independent tortfeasors as well, if it can be believed by a jury that they in any way conspired with Dr. Gary Price to withhold the plaintiff, Lisa Egan's medical records, in order to prevent her access to information that could damage their ability to defend this suit.

40

The three co-defendants in this case, Yale University, Yale-New Haven Hospital, and Dr. John Persing, all share the same attorney.

It is worth noting, that Dr. Gary Price, as an employee of the defendant, Yale University, shares that same attorney as well.

## B.    Dismissal of Count Two as to Dr. John Persing and Yale University

The defendants request that Count Two of the plaintiff, Lisa Egan's Amended Complaint be dismissed on the basis of the following premises:

1.  that there was "a single surgery"

2.  that there was "a single requirement that consent be obtained"

3.  that there was "a single claim for lack of consent"

4.  that "the claim remains the same for both, (counts): that being that Dr. John Persing performed facial surgery on December 6, 2000, without the plaintiff's informed consent"

5.  the Second Count "purports to be an independent cause of action from the First Count"

6.  "there is no basis upon which a single Negligence claim can be separated into two counts."

The defendants argument can be defeated by answering the following four questions:

1.  Was there only "a single surgery"?

2.  Was there only "a single requirement that consent be obtained"?

3.  If there were more than one surgery performed, and each surgical procedure had its own separate requirement for consent, then should the plaintiff be

41

allowed to allege separate claims for lack of consent for each individual surgery, or surgical procedure ?

4.  Do the allegations in the plaintiff'a Amended Complaint indicate that she is alleging only a single "Negligence" claim, or did the plaintiff clearly indicate that she was also alleging claims for Intentional Torts, the allegations of which in Count One and Count Two, are clearly not the same, did not occur at the same time and place, do not have the same fact patterns, and do not have the same elements to prove?

5.  Do the facts alleged in the plaintiff's Amended Compliant, if taken as true, support the existence and occurrence of separate transactions, or tortious events, that would each then carry their own separate and distinct liabilities based on the different facts surrounding each transaction and event, entitling the plaintiff to claim them in separate counts?

The plaintiff argues that there was not just "a single surgery" as the defendants contend. The defendants attempt to use the generic word "surgery" to combine any group or number of surgical procedures that happen under one single continuous dose of anesthesia, and define them as one surgical event or transaction.

The word "surgery" is often used in a generic sense to say that someone "had surgery", is "in surgery", or "underwent surgery", but the word "surgery" in actuality, is not referring to the event of the one continuous anesthetic dose, but rather the specific individual surgical procedure performed while under that anesthetic dose, of which there may be more than one.

A policeman who suffers gunshot wounds to multiple parts of his body, will undoubtedly end up in "surgery". However, when in "surgery", "having surgery", that same policeman has a shunt put in his brain, and a bi-pass performed on his heart, it is indisputable that he just had two separate surgeries or two separate "surgical procedures" performed, though under one continuous anesthetic dose.

Ask his family, or the surgeons to tell you what had just occurred, and they would answer

42

that they had just performed, (in general terms), brain surgery <u>and</u> heart surgery, or two separate "surgical procedures". If the heart was saved, but the brain was dead, then the heart surgery would be deemed a success, and the brain surgery a failure, as the two surgeries are <u>not</u> one and the same, and in this particular instance would not even be performed by the same surgeon.

If a woman goes in to have a hysterectomy due to female problems, but for convenience, at the same time, has breast implants implanted, she will have had both a medically necessary "surgery" or "surgical procedure", and also an elective "surgery" or "surgical procedure", one which will be covered by insurance, and one which will undoubtedly not.

If all surgeries or surgical procedures performed under one continuous anesthetic dose were considered "a single surgery", then surgeons would be able to bill for just "a single surgery", and insurance companies would be forced to pay for <u>all</u> surgical procedures performed while under that one continuous anesthetic dose, whether they be "elective" or not.

Since that is not the case, then both the medical profession, and the insurance carries themselves recognize that <u>each surgical procedure is its own transaction and event</u>, whether or not performed during one continuous dose of anesthesia, which is why each "surgery" or "surgical procedure" is given <u>its own surgical procedure code</u>, and <u>billed for individually</u>.

In the present case, the plaintiff had a Blepharoplasty, Septoplasty, Foreheadplasty, and two separate and distinct Rhinoplastys, and each was billed for seperately. Some of the surgical procedures were covered by insurance, and some were not. Blue Cross/Blue Shield agreed to pay for the Blepharoplasty, the Foreheadplasty, and the Septoplasty, but declined to pay for either of the two Rhinoplasty's, calling them "cosmetic surgeries".

If there were <u>only one</u> surgical transaction and event, there would have been <u>only one</u> decision as to coverage. In this case there were <u>five</u> decisions as to coverage, <u>one for each</u> of the

43

five surgical procedures, or surgeries, performed.

Further, the defendants use of the words "facial surgery" to support their contention that "a single surgery" was performed to the face to which there would then be only one claim for lack of consent, is illogical. The term "Facial surgery" is merely a general term that indicates general place.

"Facial surgery" cannot possibly indicate an actual surgical procedure as the term is not in any way an actual, technical, or legal name for any surgical procedure, and therefore can neither be billed for under that name to any insurance company, nor actually legally consented to, as the nature of what it is cannot be defined or described in terms that would be specific enough to meet the required elements of informed consent.

The defendant, Dr. John Persing, himself knows that "facial surgery" could not be the "single surgery" performed on December 6, 2000, because he did not bill the various insurance companies for one single surgical procedure called "facial surgery" and charge one bottom line fee.

The defendant, Dr. John Persing, billed for five separate surgical procedures under five separate surgery names and codes, and in doing so admitted that the surgical procedures themselves are completely different and separate, involve operation on different organs and on separate portions of the plaintiff, Lisa Egan's face and head, and were performed for different purposes, some of which were therapeutic, and some of which were aesthetic.

The Blepharoplasty was billed under its own specific surgical code of 15822. The Septoplasty was billed under its own specific surgical code of 30520, the Foreheadplasty was billed under its own specific surgical code of 67900. The originally planned Rhinoplasty was billed under its own specific surgical code of 30435, and the impromptu second Rhinoplasty was

44

billed under its own specific surgical code of 30400.

Therefore, the five surgical procedures were identified and viewed by both the defendant, Dr. John Persing, the billing department of the defendant, Yale-New Haven Hospital, the billing department of the defendant, Yale University, the billing departments of Amica Automobile Insurance Company, and the billing department of Blue Cross/Blue Shield, as five distinct and separate surgical procedures or operations, though being performed on the same day under one continuous dose of anesthesia.

Finally, though the Blepharoplasty, Septoplasty, Foreheadplasty, and Rhinoplasty, all took place on December 6, 2000, for convenience sake, they are not "a single surgery" and there is not therefore only "a single requirement that consent be obtained".

The five separate surgical procedures required five separate acts of consent.

The defendant, Dr. John Persing, before ever entering the operating room on December 6, 2000, the defendant, Dr. John Persing, had a legal duty to obtain four separate consents for the four distinctly different surgical procedures he was about to perform, four procedures which he identified under four separate surgical procedure codes, and which intended to touch and alter four separate and distinct parts of the body.

Further, before performing the fifth procedure, the decision to perform being made impromptu during the operation itself, the defendant, Dr. John Persing, had a duty to obtain the plaintiff, Lisa Egan's, consent for that procedure as well, bringing the total number of requirements for consent needed to be obtained, to be five.

The defendant, Yale-New Haven Hospital, in order to comply with that law, as well as to comply with its own policies, rules and regulations, and JCHO Accreditation Standards, required the defendant, Dr. John Persing, to obtain consent for each and every surgical procedures he was

45

about to perform. To that end, they provided the defendant, Dr. John Persing, with a Consent

Form, on their own letterhead, which he then was required to fill out and then have the patient

sign.

The Consent Form demanded that the defendant, Dr. John Persing, specify and name each

specific surgical procedure(s) or operation(s) that he was about to perform.

Therefore there was not as the defendant's contend "a single requirement for consent",

but a requirement of consent for each and every surgical procedure about to be performed.

On the plaintiff, Lisa Egan's Consent Form, dated November 27, 2000, the defendant, Dr.

John Persing, filled in the form as follows:  (quoted from Exhibit A attached)

> "The general purpose, potential benefits, possible hazards, and inconveniences of
>
> *blepharoplasty, open septorhinoplasty, collegen treatment injections to face*
> (Specify Operation, Special Procedure, or Treatment)
>
> have been explained to my satisfaction by Dr.    *J. Persing*   , and alternatives
>
> have been discussed, I,       *self*             hereby consent to the
>
> operation, special procedure or treatment named above under his/her direction,
>
> along with whatever anesthesia/sedation, medication or transfusion is necessary,
>
> the risks, benefits and alternatives of which have been explained to me."

No where on the November 27, 2000, Consent Form, did the defendant, Dr. John Persing,

write the words  "facial surgery", nor did he indicate that he was going to perform just one

"single surgery".

On the contrary, the defendant, Dr. John Persing, filled in the blank with three of the five

surgical procedures that he ended up performing on December 6, 2000.

46

On November 27, 2000, the defendant, Dr. John Persing, did not list the Foreheadplasty on the Consent Form, as it was not addressed or consented to until five days <u>after</u> the Consent Form was signed, and then it was only consented to <u>orally</u>.

Nor did the defendant, Dr. John Persing, list the impromptu second Rhinoplasty, as it was never consented to at all, due to the fact that it was not even contemplated by the defendant, Dr. John Persing, until <u>after</u> the plaintiff was asleep under anesthesia on December 6, 2000.

The defendant, Dr. John Persing's listing of the surgical procedures as separate surgeries, admits that he knew that they <u>were not all one and the same surgery</u>, or even a <u>"single surgery"</u>, and that <u>individual consent was required for each of the procedures, operations, and treatments that he listed and intended to perform</u>.

Therefore, the defendants cannot now contend that those surgical procedures are now somehow one and the same, or that they are now only one "single surgery".

In order to defend that contention, the defendants would have to produce a specific name for what that "single surgery" is, as no names for any "single surgery" are listed anywhere on any paperwork other than the five separate names already defined  by the defendant, Dr. John Persing's billing, and the plaintiff's allegations, those being the five surgical procedures known as a Blepharoplasty, Septoplasty, Foreheadplasty, and the two separate Rhinoplasty(s).

Without a specific name, there could have been no consent at all, as one cannot consent to that which is not named, is not a known entity, and is not described specifically.

Finally, though the Consent Form states its terms only once to avoid redundancy, those terms are meant to be applied <u>to each and every surgical procedure listed on the form</u>, <u>separately and individually</u>.

The Consent Form itself asks the signer to agree that the risks, side effects, and alternative

procedures were explained to them regarding a particular procedure.

If the Consent Form were only asking if those risks and alternatives were explained for just one of the procedures listed, and that then the disclosure for one procedure would apply to all other procedures, then no legal or appropriate consent would have been given to the other procedures whose risks, side effects, and alternative procedures were not addressed or explained..

The Consent Form is asking the question of consent as many times as there are surgical procedures listed on the Form. Therefore, the Consent Form admits that there is not one requirement for Consent, but as many requirements as there are surgical procedures.

Finally, there is no legal foundation for the premise that the November 27, 2000 Consent Form, a form which only consents to the three surgical procedures listed as Blepharoplasty, Rhinoplasty, and Septoplasty, somehow also fulfills the requirement of consent as to the Brow Lift, when the Brow Lift is nowhere mentioned on the November 27, 2000, Consent Form, and the form was signed five days prior to the long distance telephone conversation in which the plaintiff, Lisa Egan, actually orally consented to the Foreheadplasty procedure.

Nor is there any legal foundation for the premise that the fifth procedure, wholly unanticipated, could ride the wave of the original Consent Form dated November 27, 2000, when it was never even planned for until it was performed on December 6, 2000..

To agree with the defendants premise that there was "a single surgery" and "a single requirement" for consent, would be to deem the legal requirement of consent to be moot, and to allow surgeons to suddenly add more procedures to perform at whim while their patients lay asleep, charge them for the unanticipated elective procedure, and then turn bill collectors and lawyers loose on them when they refuse to pay for that which they neither knew about, nor ever consented to.

48

The doctrine of consent cannot be legally be deemed moot

Therefore, even if the defendants can win on their argument that the Consent Form only indicates a "one requirement" rule for all procedures listed on the Consent Form, the actual time and place facts relating to this particular case logically support that there still had to be <u>at least three requirements of consent.</u>, those being: <u>one distinct requirement</u> for the Blepharoplasty, Septoplasty, and original Rhinoplasty discussed and assented to in the offices of the defendant, Dr. John Persing <u>prior</u> to the signing of the Consent Form on November 27, 2000, <u>one distinct requirement</u> for the Foreheadplasty, discussed and assented to in the conversations <u>subsequent</u> to November 27, 2000, and <u>one distinct requirement</u> for the extra unanticipated Rhinoplasty procedure performed impromptu on December 6, 2000.

A Consent Form signed on November 27, 2000, except in cases of emergency, which this absolutely was not, <u>can only swear to that which was discussed and addressed prior to its signing</u>.

Whether one is a patient, or a physician, one cannot swear to disclosures, discussions, and agreements, that have not yet taken place.

The law below supports the plaintiff, Lisa Egan"s, argument above.

In the landmark case of <u>Canterbury v. Spence</u>, 64 F.2d 772 (D.C. Cir. 1972) cert . Denied, 409 U.S. 1064, 93 S. Ct. 560 (1972) the court determined that the need for informed consent arises out of one's right to determine what shall be done with one's own body, and that it is therefore, the patient's prerogative to decide whether <u>any particular procedure</u> should be undertaken.

The duty to obtain informed consent is held to be imposed by law as opposed to medical malpractice <u>Calabrese v. Trenton State College</u>, 162 N.J. Super. 145 392 A.2d 600 (A.D. 1978)

A patient has a constitutional right of privacy, and a common law right to withhold their

consent or to refuse treatment. Foy v. Greenbolt, 141 Cal. App. 3d 1, 190 Cal. Rptr.84 (1983).

The court, in Mohr v. Williams 95 Minn. 261, 104 N.W. 12 (1905) stated that  "If defendant's act was unauthorized, then it was, within what we have said, unlawful.  It was a violent assault, not a mere pleasantry; and, even though no negligence is shown, it was wrongful and unlawful."

In Cobbs v. Gant, 8 Cal. 3d 229,104 Cal. Rptr. 505, 502 P.2d 1 (1972) the court held that the consent of a patient is a prerequisite for every surgical procedure or operation..

In Cross v. Trapp, 294 S.E. 2d 446 (W. Va. 1982), and in Logan v. Greenwich Hospital Assn., 191 Conn. 282, 465 A.2d 294 (1983) it was held that the signing of a hospital Consent Form indicating that the patient consented to treatment, including surgery , is not a valid consent where the Consent Form does not specifically refer to the procedure or operation actually to be performed which resulted in the patients injury.

Therefore, even had the plaintiff consented to the general word "surgery" or "facial surgery" it could not possibly be legal consent, as the five individual surgical procedures performed on December 6, 2000, are required to have been individually named, and individually consented to.

Further ---

In Parikh v. Cunningham, 493  So. 2d 999 (Fla. 1986) the court found that even whether there is written consent, that consent is not conclusive; it presents a factual question as to whether the form was signed following an explanation of the risks inherent to the procedure and the alternative treatments.

When a procedure is not emergency surgery, the physician has an obligation to tell the patient of any alternative procedures and of complications likely to follow.  Harrigan v. United

States 408 F. Supp, 177 (E.D. Pa. 1976)

It was found in Haley v. United States, 739 F.2df 1502 (10th Cir. 1984) that in the absence of such information the consent is ineffectual.

In Congrove v. Homes, (1973) 37 Ohio Misc. 95, 66 Ohio Ops 2d 295, 308 NE2d 765 the Court said that informed consent consists of a duty imposed by law on a physician to inform his patient of the nature of the surgery he intends to perform, the probable consequences, risks, and hazards of this procedure, and the benefits that can be anticipated; that a physician who fails in this responsibility and duty has failed to give his patient sufficient information which to base a consent to an operative or treatment procedure, and that breach of this duty is recognized as tortious misconduct actionable as medical negligence where harm proximately results.

In Canterbury v. Spence, 464 F.2d 772 (D.C. Cir. 1972) cert. Denied, 409 U.S. 1064, 93 S. Ct. 560 (1972) the court held that the physicians under an obligation to alert the patient to the diagnosis, the general nature of the contemplated procedure, the risks involved, the prospect of success, the prognosis if the procedure is not performed, and the alternative medical treatments to the procedure, if any.

The physicians duty to disclose must be guided by what he knows or should know to be a patient's informational needs in intelligently choosing whether to undergo the proposed medical treatment.

In Cobbs. V. Grant, 8 Cal. 3d 229, 104 Cal. Rtr. 505, 502 P.2d at 11 (1972) the court stated "The patient's right of self-decision is the measure of the physician's duty to reveal. That right can be effectively exercised only if the patient possesses adequate information to enable an intelligent choice."

Thus the test for measuring the physician's duty to divulge risks is whether such data will

be material to the patients decision. <u>Cooper v. Roberts,</u> 220 Pa. Super. 260, 286 A.2d 647 (1971)

In <u>Canterbury v. Spence,</u> 64 F.2d 772 (D.C. Cir. 1972) cert . Denied, 409 U.S. 1064, 93 S. Ct. 560 (1972) a material risk was defined as follows:  "A risk is material when a reasonable person, in what the physician  knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed treatment."

The physician is required to make reasonable disclosures, <u>Hood v. Philips,</u> 537 S.W.3d 291 (Tex. Civ. App. 1976) in lay terms understandable to the patient. <u>McKinney v. Nash,</u> 120 Cal. App. 3d 428, 174 Cal. Rptr. 64 (1981).

The patient should then be permitted to weigh the risks and choose among the available procedures or to forego treatment altogether. <u>Lambert v. Park,</u> 597 F2d 236 (10th Cir. 1979)

Therefore, there was <u>not just one "single requirement"</u> for the disclosure of risks, side effects, and alternatives, as the risks, side effects, and alternatives to the Blepharoplasty, Septoplasty, Foreheadplasty, and Rhinoplasty, are completely different from each other, are in no way dependent or connected to each other, and are <u>not interchangeable</u>.

If the law mandates that consent be obtained, and the key element to consent being obtained is the physician's disclosure of the risks, side effects, and alternative procedures to a surgical procedure, than there would have to be five separate requirements for five separate disclosures, as a disclosure to one could not possible be a disclosure to all.

To uphold the defendant's contention that there was "a single claim for lack of informed consent" would be to say that if a surgeon discloses the risks and side effects to a Blepharoplasty, a surgical procedure performed on the eyelids, that such disclosure would suffice for disclosures of risks and side effect relating to a Septoplasty, Foreheadplasty, and Rhinoplasty, though those

surgical procedures are not performed on the eyelids, and have nothing to do with vision.

Further, to uphold the defendants' contention would be to state that if a surgeon discloses the nature of any one of the surgical procedures about to performed, that such disclosure suffices for the rest of the surgical procedures about to be performed, though disclosure as to the nature of a Rhinoplasty procedure on the nose, cannot possibly inform a patient as to the nature and manner of the performance of a Foreheadplasty, Blepharoplasty, or Septoplasty, performed on other parts of a patient's face.

Further still, to uphold the defendants' contention would be to state that if a surgeon discloses the alternative procedures to a Foreheadplasty, such as an Endoscopic Lift, (a procedure performed on the top of the head at the scalp), would suffice for disclosure as to the alternative procedures to the Blepharoplasty, Septoplasty, or Rhinoplasty, though that alternative procedure is not in any way related or alternative to the physical conditions of the plaintiff, Lisa Egan's deviated septum, hooded eyelids, or deformed nasal tip.

Finally, if the law demands that a patient be given a chance to weigh the risks, side effects, and alternatives to a particular treatment or surgical procedure, before a physician performs that particular treatment or surgical procedure, then the plaintiff, Lisa Egan, must have been afforded the opportunity to weigh the risks, side effects, and alternatives to each of the five proposed surgical procedures, that weighing be done five separate and distinct times.

Lack of consent is proved by the facts surrounding the time and place consent was given, the manner it was given, and whether the risks, side effects, and alternatives were explained prior to the patient's giving of their consent.

In the present case, the particular times and places when the individual procedures were discussed and consented to, as well as the particular terms and conditions under which they were

53

consented to, <u>are not the same times and places, or terms and conditions, for all five of the</u> <u>surgical procedures</u> which were ultimately performed on December 6, 2000.

More importantly, those times and places, and terms and conditions, are not at all the same for the Rhinoplasty, in Count One, as they are for the Foreheadplasty, in Count Two.

The consent for those two procedures were obtained on different dates, under different circumstances, and under different terms and conditions.

The consent for the original Rhinoplasty was obtained in writing on November 27, 2000, in the defendant, Dr. John Persing's examination room, while the consent for the Foreheadplasty, was obtained orally over the telephone five days later, after there were three conversations held subsequent to the signing of the November 27, 2000 Consent Form, authorizing the Rhinoplasty.

The second impromptu Rhinoplasty, had no consent at all, as the plaintiff slept unaware of its occurrence until after it was already performed.

The fact patterns surrounding the consent to the surgical procedures which are at issue in this suit, are <u>not</u> the same.

Therefore, the transactions are not the same, and the plaintiff is not limited to "a single claim for lack of informed consent".

Nor, as the defendants contend, is the plaintiff limited to a single "Negligence" claim. In the present case, the causes of action are separate, in that the wrongs committed regarding the Rhinoplasty, are separate from the wrongs committed regarding the Foreheadplasty, and therefore entitle the plaintiff, Lisa Egan, to allege "Negligence" in two counts.

Further, the allegations alleged in the two Counts of the plaintiff's Amended Complaint clearly define numerous Intentional Torts, and those Intentional Torts were specifically different for the Rhinoplasty in Count One than they were for the Foreheadplasty in Count Two.

All one has to do is remove the allegations of Count Two against the Foreheadplasty, to quickly realize that the facts of Count One regarding the Rhinoplasty, cannot possibly prove anything regarding the allegations made as to the Foreheadplasty.

As a matter of law the failure to obtain informed consent imposes liability on the physician. Gasman v. United States, 589 F. Supp. 1534 (M.D. Fla. 1984);

However, whether a cause of action for lack of consent is able to be brought under the theory of an Assault and Battery, under the theory of Negligence, or under both theories, is recognized as being dependant on certain fact patterns.

The particular facts of this case entitle it to be brought as both Negligence and Intentional Tort(s), which then allows for different claims and counts to be alleged under different tort theories, such as Assault and Battery, Trespass to Person, Invasion of Privacy, and False Imprisonment.

Issues of consent can arise in several contexts. In the plaintiff, Lisa Egan's Amended Complaint, the following six issues were addressed and alleged, each of which bring with it the necessary requisite fact patterns that allow the plaintiff to bring this suit as either Negligence or an Intentional Tort, which would therefore allow it to be alleged in separate Counts:

(1)  total lack of consent;   Wilson v. Lahman, 379 SW2d 478 (Ky. App. 1964)

(2)  failure to adequately explain procedures and risks so that the patient's consent is informed;   Roberts v. Wood, 206 F. Supp 579 (SD Ala 1962)

(3)  performance of an additional and separate operation or a completely different operation from the one for which consent was given;   Rogers v. Lumberman's Mutual Casualty Company, 119 So2d 649 (La. App. 1960)

(4) performance of an operation that was substantially more serious than the one for which consent was given;   Carroll v. Chapman, 139 So2d 61 La. App. (1962)

(5) extension of an operation beyond its proper bounds;   Wheeler v. Barker, 92 Cal. App2d 776. 208 P2d 68 (1949)

(6) and performance of an operation contrary to the patient's express wishes. Meretsky v. Ellenby, 370 So2d 1222 (Fla. 1979)

The court in Congrove v. Holmes (1973) 37 Ohio Misc. 95, 66 Ohio Ops 2d 295, 308 NE2d 765  stated that "the consent to an operation or treatment procedure which is the product of an uninformed patient is in fact no consent continued the court, and the performance of the operation, treatment, or procedure becomes Assault and Battery as well as Negligence, and in which case the degree of skill employed by the physician in performing the operation, treatment or procedure, is immaterial and irrelevant."

In Brown v. Wood , 202 So. 2d 125 (Fla. Dist. Ct. App. 1967)  it was held that, where consent is uninformed, performance of the operation, treatment, or procedure becomes Assault and Battery, as well as Negligence, and can be brought in either.

However, if a distinction must be applied, the general distinction made by most courts is that an Assault and Battery theory may be maintained when the patient consents to a particular operation and the physician performs a different one, and a Negligence action is appropriate where the patient gives what he believes is informed consent, but in reality he has not been completely informed of the risks or of alternative treatments.  Moser v. Stallings, 387 N.W.2d 599 (Iowa 1986)

56

More specifically, the Assault and Battery theory has been applied in situations where the physician either <u>failed totally to obtain the patient's consent, intentionally overstepped that consent without just cause, or obtained that consent by fraud</u>.  The theory of Assault and Battery has also been applied to situations where the physician <u>made no disclosure at all</u> of <u>any risks</u>, side effects, or alternatives to a surgical procedure <u>prior</u> to obtaining the patient's consent.

Where the physician made <u>some</u> disclosure regarding the risks, side effects, and alternatives inherent to a particular surgical procedure,  but the propriety of that disclosure is in question, the correct theory is usually found to be Negligence

In <u>Nelson v. Patrick</u>, 58 N.C. App. 546, 293 S.E.2d 829 (1982) it was held that where a medical procedure <u>is completely unauthorized</u> it constitutes an Assault and Battery, ie. Trespass to the person.

The California Supreme Court best explained the rational in <u>Cobbs v. Grant</u>, 8 Cal. 3d 229, 104 Cal. Rptr. 505, 502 P.2d 1 (1972), when it stated:  "The [Assault and] Battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented.  When the patient gives permission to perform one type of treatment and the doctor performs another<u>, the requisite element of deliberate intent to deviate from the consent given is present.</u>

Further, in the absence of explanation of risks inherent in the procedure, and alternative treatments, the consent is ineffective.

It was held in <u>Parikh v. Cunningham</u>, 493  So. 2d 999 (Fla. 1986) that a patient's written consent is only valid if the physician has adequately explained the proposed procedure, and medically acceptable alternatives, and the substantial risks and hazards inherent in the proposed treatment or procedure.

57

A physicians failure to inform a patient of serious potential risks can give rise to a cause of action in Medical Malpractice. <u>Zahorsky v. Griffy, Dysart, Taylor, Penner & Lay, P.C.</u>, 690 S.W. 2d 144 (Mo. Ct. App. 1985).

In <u>Sauro v. Shea</u>, 257 Pa. Super. 87, 390 A.2d 259 (1978) a physician was held liable for failure to inform the patient of potential fatal risk in anesthesia, notwithstanding that the uninformed patient had signed a consent form.

A physician is under a duty to warn his patient of the known risks of the proposed treatment or surgery, so that the patient can make an intelligent decision as to whether he will submit to such treatment. <u>Cole v. Wiggins,</u> 487 So. 2d 203 (Miss. 1986).

A causal connection exists between the physician's failure to divulge and the damage suffered when the disclosure of the risks would have resulted in a decision against the treatment. <u>Flannery v. President & Director of Georgetown College</u>, 679 F.2d 960 (D.C. Cir. 1982)

It was held in <u>Moser v. Stallings,</u> 387 N.W. 2d 599 (Iowa 1986) that the doctrine of disclosure is based on the patients right to exercise control over his own body by making an informed choice regarding submission to a particular treatment. The physician is under a duty to disclose possible adverse results.

The court held in <u>Haley v. United States,</u> 739 F.2d 1502 (10th Cir. 1984). that a patient is not adequately informed and therefore <u>consent is not deemed to be given</u> when a physician fails to tell her about potential side effects of a surgical procedure, including the possible removal of her uterus. <u>Hansbrough v. Kosyak,</u> 490 N.E.2d 151 (ill. Ct. App. 1986) <u>Estrada v. Jacques,</u> 321 S.e.2d 240 (N.C. Ct. App. 1984)

The court found in <u>Powers v. United States,</u> 589 F. Supp. 1084 (D. Conn. 1984) it was found that the failure to disclose to the patient about to undergo posterior cervical facet fusion

58

that a significant percentage of persons who undergo this procedure experience post-operative neurological problem <u>invalidated the patients consent.</u>

In <u>Russel v. Hardwick</u>, 166 So. 2d 904 (Fla. App. 1964) that same duty was found where a patient was not informed that a possible hazard in the removal of a cancerous lymph node was the severing of nerve fibers of the brachial plexus, as well in <u>Patrick v. Sedwick</u>, 391 P2d 453 (Ala. 1964) where the plaintiff was not informed of the possible severing of the laryngeal nerve, and as well in <u>Berkey v. Anderson,</u> 1 Cal App3d 790, 82 Cal Rptr 67 (1969) where the plaintiff was not informed of the general nature of myelogram or the dangers involved

Further, where there is more than one known course of treatment, the patient should be informed of the alternatives in order to better decide whether to undergo the treatment proposed. The physician is required to advise the patient of the alternative treatments available to him and the risks attendant to each.

In <u>Harrigan v. United States,</u> 408 F. Supp. 177 (E.D. Pa. 1976) it was held that when an operation is <u>not emergency surgery,</u> the physician has an obligation to tell the patient of alternative possibilities and of complications likely to follow.

It was held in <u>Cunninham v. Yankton</u>, 262 N.W. 2d 508 (S.D. 1978) that a patient should have been told that surgical removal of a pin in her elbow area would leave her with a permanently deformed wrist, and that alternative modes of treatment existed, including the use of antibiotics.  see also <u>Logan v. Greenwich Hosp. Assn</u>. 191 Conn. 282, 465 A.2d 294 (1983); <u>Todd v. United States</u>, 570 F. Supp. 670 (D.S.C. 1983); <u>McGrady v. Wrights</u>, 151 Ariz. 534, 729 P2d 338 (Ct. App. 1986)

Finally, it was held in <u>Truman v. Thomas</u>, 27 Cal. 3d 285, 165 Cal. Rptr. 308, 611 P.2d 902 (1980) that a physician must disclose not only "material information" ie. that which the

59